UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DONNA YUK LAN LEONG (01), MAX JOHN SWORD (02), ROY KEIJI AMEMIYA JR. (03),<br><br>Defendant. | CR. NO. 21-00142 LEK<br><br>ORDER |

**ORDER REGARDING UNITED STATES' MOTION FOR
JUDICIAL INQUIRY INTO CONFLICTS OF INTEREST WITH RESPECT TO
ATTORNEY THOMAS M. OTAKE, [FILED 2/14/23 (DKT. NO. 194)]**

Plaintiff United States of America ("the Government")

seeks judicial inquiry into issues that it believes amount to

conflicts of interest by Thomas M. Otake, Esq., counsel for

Defendant Donna Yuk Lan Leong ("Leong"), in his representation

of Leong in the instant matter because of his professional and

financial relationship with Loretta Sheehan, Esq., a witness

that the Government intends to call at trial.  See Govt.'s

Motion for Judicial Inquiry into Conflicts of Interest with

Respect to Attorney Thomas M. Otake ("Motion"), filed 2/14/23

(dkt. no. 194).  Leong responds to the Motion stating that much

time and care was taken to analyze and consider any potential

conflict issues related to Ms. Sheehan's former service as a

member of the Honolulu Police Commission and the fact that

Mr. Otake and Ms. Sheehan are partners in the same law firm; that, as a result, Mr. Otake has concluded that he could ethically undertake representing Leong; that Leong has consulted with independent counsel regarding Mr. Otake's continued representation of her; and that Leong's Sixth amendment right to counsel of her choice must not be infringed.  See Leong's Response to United States' Motion for Judicial Inquiry into Conflicts of Interest with Respect to Attorney Thomas M. Otake ("Mem. in Opp."), filed 3/10/23 (dkt. no. 205).

For the reasons stated below, the Court finds that Ms. Sheehan's belief that an attorney-client relationship was formed with Mr. Otake is not objectively reasonable because she has not established that she approached Mr. Otake to retain his services as an attorney and to receive his legal advice. Rather, the judicial inquiry discloses that they engaged in collegial consultation in an informal setting about a confidential matter she was handling independently of Mr. Otake. However, the Court gives great deference to Leong's right to conflict-free counsel.  Ms. Sheehan will be called to testify at trial against Leong, and the Court finds that a perceived conflict of interest could exist for Mr. Otake.  This perceived conflict, however, does not prevent Mr. Otake's continued representation of Leong so long as Ms. Sheehan gives her knowing consent to his representation of Leong by filing a written

agreement to Mr. Otake's representation of Leong and a written waiver of conflict, and Leong gives her knowing consent to his continued representation of her by executing and filing a written waiver of conflict in this matter.

The Court also finds that Mr. Otake is not likely to be a witness at trial in this matter; that Mr. Otake's partnership in the same law firm as Ms. Sheehan does not create a conflict of interest; and that Leong and Ms. Sheehan's interests are not materially adverse.

Based on the reasoning below, the Court finds that an actual attorney-client relationship was never formed between Ms. Sheehan and Mr. Otake but finds that a **slight possibility** exists that an implied attorney-client relationship may been formed based on Ms. Sheehan's subjective belief.  The Court further finds that any implied attorney-client relationship was limited to one instance where Ms. Sheehan spoke to Mr. Otake on a car ride to the airport, and that the Court cannot conclude that Mr. Otake "was so involved in [advising Ms. Sheehan] that the subsequent representation [of Leong] can be justly regarded as a changing of sides in the matter . . . ."  See State v. Mark, 123 Hawai`i 205, 235, 231 P.3d 478, 508 (2010) (emphasis and citation omitted).  Thus, his subsequent representation of Leong is not prohibited.

Mindful of Leong's right to conflict-free representation, the Court directs the Government to obtain and file a declaration from Ms. Sheehan that states, at a minimum, that she has consulted with the attorneys for the Government regarding the nature and scope of the testimony that the Government intends to present through her as a witness at trial; that she consents to Mr. Otake's representation of Leong, including at the trial in which Ms. Sheehan will be called to testify; that she does not waive any attorney-client privilege, if any exists, between herself and Mr. Otake; and that she waives any conflict, implied or actual, that may exist as a result of Mr. Otake's representation of Leong.  This declaration shall be filed no later than **April 27, 2023.**

The Court directs Leong to file a declaration that states, at a minimum, that she has consulted with an independent counsel regarding the Motion and the Government's position that a potential or actual conflict of interest exists as to Mr. Otake's continued representation of her in the instant matter because of his law partnership with Ms. Sheehan, her role as a witness being called to testify against Leong, and her claim that Mr. Otake served as one of her attorneys during her term as a police commissioner; that Leong acknowledges being informed of the Court's finding that there is a slight possibility that an implied attorney-client relationship was

4

formed between Ms. Sheehan and Mr. Otake for the purpose of advising Ms. Sheehan during her term as a police commissioner; and that she knowingly and intelligently waives any conflict, implied or actual, that exists in Mr. Otake's continued representation of her.  This written waiver of conflict shall be filed by no later than **April 27, 2023.**

## BACKGROUND

This criminal prosecution arises out of the superseding criminal indictment filed on March 17, 2022.  See First Superseding Indictment, filed 3/17/22 (dkt. no. 79).  The facts underlying this superseding indictment are familiar to the parties and the Court will not repeat them here, except as relevant to the instant Motion.  An evidentiary hearing was held on March 31, 2023 and, at the Court's request, Ms. Sheehan was called as a witness.

Mr. Otake and Ms. Sheehan, at least up to the time of the hearing on the Motion and at the time that Mr. Otake commenced representation of Leong, were partners in a law firm known as Davis Levin Livingston ("the Law Firm").  [Suppl. Decl. of Thomas M. Otake Related to the Government's Motion for Judicial Inquiry into Conflicts of Interest, filed 3/29/23 (dkt. no. 214) ("Otake Suppl. Decl.").]  Ms. Sheehan served as a police commissioner for the City and County of Honolulu ("the City"), and her term of service on the Honolulu Police

5

Commission was from August 15, 2016 to June 1, 2020.  [Motion, Decl. of Loretta A. Sheehan ("Sheehan Decl.") at ¶¶ 1-3.]  She was a partner at the Law Firm before, during and since her tenure on the Honolulu Police Commission and is currently a partner.  [Id. at ¶ 4.]  During the period when she was a police commissioner, she played a role in determining compensation for the Law Firm's attorneys.  [Id.]

During the time that she served on the Honolulu Police Commission, Ms. Sheehan sought and received legal counsel from her law partners at the Law Firm and considered them to be her attorneys.  [Id. at ¶ 7.]  It is undisputed that Mr. Otake was Ms. Sheehan's law partner in the Law Firm during her term as a police commissioner, and that this law partnership existed, at least up to the time of the hearing on the Motion.  See Otake Suppl. Decl. at ¶ 3.  No evidence has been presented that a written or oral legal retention agreement was entered into between Ms. Sheehan and Mr. Otake, nor that they agreed to any financial remuneration for legal services.

Ms. Sheehan testified at the evidentiary hearing that she did, on one occasion, seek a legal opinion from Mr. Otake regarding an issue involving her work as a police commissioner, and that an attorney-client relationship existed between her and Mr. Otake regarding her work on the Honolulu Police Commission. [Rough transcript of 3/31/23 hearing on the Motion ("Rough

Trans.") at 7-8.]  This discussion occurred during a car ride where Ms. Sheehan was leaving on a trip and Mr. Otake was dropping her off at the airport.  [Id. at 10-11.]  Mr. Otake does not recall this discussion, and states that he did not agree to be Ms. Sheehan's attorney at any point.  [Mem. in Opp., Decl. of Thomas M. Otake ("Otake Decl.") at ¶ 32; Rough Trans. at 26, 28.]  She believes that an attorney-client relationship was also created with other partners at the Law Firm regarding advice sought about Police Commission matters.  [Rough Trans. at 6-7.]  She also testified that she has no objection to Mr. Otake's representation of Leong, and that she is willing to give her consent to this representation.  [Id. at 15.]

The Government states that it intends to call Ms. Sheehan at trial to testify about her opposition to and criticism of a settlement with former Honolulu Police Department ("HPD") Chief of Police Louis Kealoha that was approved by the Honolulu Police Commission. [Motion at 1, 3-4.]  It contends that Ms. Sheehan's testimony will adversely implicate Leong. [Id. at 5.]

## DISCUSSION

The Government acknowledges Leong's constitutional right to be represented by counsel of her choice but brings the instant Motion because it contends that Mr. Otake is precluded by the Hawai`i Rules of Professional Conduct from continued

7

representation.  See id. at 7-10.  First, the Government argues that Rule 1.10 precludes Ms. Sheehan as a witness of the Government from representing Leong and thus, by extension, Mr. Otake (as her law partner) is likewise precluded.  See id. at 9.  Second, it contends that Mr. Otake's law partnership with Ms. Sheehan binds him financially and professionally with her that he has "a significant personal stake" in Ms. Sheehan who will be "a critical adverse witness" to his client, Leong, that will "undermin[e] Otake's ability to vigorously defend [Leong]." [Id. (citing HRPC 1.7.)]  Third, Otake may have to testify as a witness at trial and thus is precluded by the "witness-advocate rule."  [Id. at 10 (citing HRPC 3.7).]

I.   **Formation of Attorney-Client Relationship**

At the hearing, Ms. Sheehan testified that she believes an attorney-client relationship was formed with Mr. Otake during her tenure as a police commissioner because of one specific conversation in which Mr. Otake gave legal advice and guidance, and that the attorney-client relationship did not continue after her tenure on the Police Commission.  [Rough Transcript at 7-8.]  This conversation occurred during a car ride to the airport where Mr. Otake drove Ms. Sheehan because she had a flight immediately after the meeting in which the Police Commission "voted to provide Chief Kealoha with a quarter million dollars in a severance package . . . ."  [Id. at 10-11.]

Ms. Sheehan has no objections to Mr. Otake's representation of Leong so long as Ms. Sheehan's confidential communications with Mr. Otake stay confidential.  [Id. at 15.]  Mr. Otake denies that an attorney-client relationship was formed with Ms. Sheehan, and states that he does not remember the conversation during the car ride with Ms. Sheehan at all.  [Id. at 28.]

To determine whether an attorney-client relationship was formed,

> [t]he Court looks to the nature of interaction between the parties to determine whether an attorney-client relationship exists.  "Whether and to what extent an attorney-client relationship is present is a question of fact." Stender v. Vincent, 92 Hawai`i 355, 363, 992 P.2d 50, 58 (Haw. 2000).  "An attorney-client relationship is contractual and consensual, and such a relationship can be formed only with the consent of the attorney and individual seeking representation." Boskoff [v. Yano], 57 F. Supp. 2d [994,] 998 [(D. Hawai`i 1998)].  "An attorney-client relationship is formed when an attorney renders advice directly to a client who has consulted him seeking legal counsel." Id. (citing Waggoner v. Snow, Becker, Kroll, Klaris & Krauss, 991 F.2d 1501, 1505 (9th Cir. 1993)).  In Boskoff, this Court recognized factors that are relevant in determining whether or not an attorney client relationship has formed:
>
>> The court may look to the intent and conduct of the parties to determine whether the relationship was actually formed.  One factor to be considered is whether the client believed an attorney-client relationship existed.  However, the belief must be objectively reasonable under the totality of the circumstances, which

9

> includes consideration of factors such as
> the intent of the alleged client and
> attorney and payment arrangements.

> _Boskoff_, 57 F.Supp.2d at 998 (citations and
> quotations omitted).

_McDevitt v. Guenther_, 522 F. Supp. 2d 1272, 1281 (D. Hawai`i 2007) (holding that no express attorney-client contract was formed but an implied attorney-client relationship may have been established).  Here, the factor in favor of finding that an attorney-client relationship was formed is Ms. Sheehan's testimony that she believed an attorney-client relationship was formed when she asked Mr. Otake during the car ride to the airport for his opinion on a confidential Police Commission matter.  The factors against such a finding are that: Mr. Otake did not agree to an attorney-client relationship; there is no evidence that any payment arrangements or terms of engagement were made; and the exchange took place between two law partners during a casual encounter.

Under certain circumstances, an implied professional relationship may exist:

> "'[W]here . . . there is no express
> attorney-client relationship, there [may] exist
> [] nevertheless a fiduciary obligation or an
> implied professional relation[.]'" _Otaka, Inc.
> v. Klein_, 71 Haw. 376, 382, 791 P.2d 713 (1990)
> (quoting _Westinghouse Electric Corp. v. Kerr-
> McGee Corp._, 580 F.2d 1311, 1319 (7th Cir. 1978))
> (first set of brackets added).  In defining the
> parameters of when a fiduciary relationship may

10

be created as a result of legal work, the Hawai`i
Supreme Court explained:

> A fiduciary relationship may result because
> of the nature of the work performed and the
> circumstances under which confidential
> information is divulged.  Legal consultation
> occurs when the **client** believes that he is
> approaching an attorney in a professional
> capacity with a manifest intent to seek
> professional legal advice.  Thus, the
> deciding factor is what the prospective
> client thought when he made the disclosure,
> not what the lawyer thought.

> Otaka, 71 Haw. At [sic] 383 (internal citations and
> quotation marks omitted). . .

Isuzu Motors Am., LLC v. Jackson, Civil No. 13-00306 DKW-KSC,

2015 WL 1349619, at *3 (D. Hawai`i Mar. 24, 2015) (some

alterations in Isuzu Motors).  However, where a person believes

that an attorney-client relationship has been formed, she must

have had **an objectively reasonable belief**:

> Furthermore, while the putative client's
> subjective belief is an important factor for
> determining the existence of an attorney-client
> relationship, the client's belief must be
> objectively reasonable.  "Courts have refused to
> disqualify counsel, for example, where the
> prospective client should have known that the
> relationship had not advanced to the point where
> it could be deemed a representation."  In re
> Johore Investment Co., 157 B.R. 671, 676 (D. Haw.
> 1985). . . .

McDevitt, 522 F. Supp. 2d at 1283.  In addition, Ms. Sheehan

(and by extension, the Government) has the burden of proving the

attorney-client privilege exists:

11

With regard to the lawyer-client privilege, we have held that "[p]roper practice requires preliminary judicial inquiry into the existence and validity of the privilege and the burden of establishing the privilege rests on the claimant." Sapp [v. Wong], 62 Haw. [34,] 38, 609 P.2d [137,] 140 [(1980)].  This inquiry must be "meaningful" and "'turns largely on the client's subjective belief that it exists,' and the character of the communication, which must be intended as confidential[.]" DiCenzo v. Izawa, 68 Haw. 528, 536, 723 P.2d 171, 176 (1986) (quoting In re McGlothlen, 99 Wash.2d 515, 663 P.2d 1330, 1334 (1983)).  Thus, in order to determine whether the Department could properly claim that the report is protected from disclosure by state law, a meaningful preliminary judicial inquiry must be conducted to determine whether it was communicated in the context of a lawyer-client relationship. . . .

Honolulu Civ. Beat Inc. v. Dep't of Att'y Gen., 146 Hawai`i 285, 293-94, 463 P.3d 942, 950-51 (2020) (some alterations in Honolulu Civil Beat).

The Court finds that the judicial inquiry in this matter establishes that an informal discussion took place between colleagues and outside of the law office on one occasion (when Mr. Otake drove Ms. Sheehan to the airport); that Ms. Sheehan's subjective belief was that an attorney-client relationship was formed as a result; and that she intended their communications to be confidential because she was disclosing information obtained from a Police Commission meeting and, as a police commissioner, she was obliged not to disclose that information.  Under these circumstances, the Court cannot

conclude that a request for a colleague's thoughts or opinion is a request for legal advice and representation.  Compare id. at 296, 463 P.3 at 953 ("A request [to] . . . conduct an investigation is not necessarily a request that [the lawyer] provide legal services.").  Said another way, the Court concludes that Ms. Sheehan's subjective belief that Mr. Otake was her attorney was not objectively reasonable.

## II.  Conflict of Interest Because of Representation of Former Client

### A.  Hawai`i Rules of Professional Conduct 1.9(a)

Mr. Otake is precluded from representing Leong if he formerly represented Ms. Sheehan and the instant prosecution is "the same or a substantially related matter" in which Leong's interests are "materially adverse" to Ms. Sheehan's interests, unless Ms. Sheehan consents after consultation.  HRPC 1.9(a).[1] Because the Government intends to call Ms. Sheehan as a witness against Leong in this matter, the Court finds that the Government has shown that her testimony arises out of the "same or a substantially related matter."  The Court has determined

---

[1] HRPC Rule 1.9, titled "Conflict of Interest: Former Client," states, in pertinent part: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation . . . ."  HRPC 1.9(a).

from its judicial inquiry that Mr. Otake did not formerly represent Ms. Sheehan because her subjective belief was not objectively reasonable.  However, because the Court also found that there was a slight possibility that an implied attorney-client relationship could have been created, it considers whether Leong's interests are "materially adverse" to those of Ms. Sheehan's.

The Government argues that "[Ms.] Sheehan's membership in the Commission, forceful criticisms of the payout, and public service legacy, are anathema to the task of defending Leong's machinations before the same Commission, which implicate the core allegations of the First Superseding Indictment."  [Motion at 11 (citation omitted).]  The Government is incorrect.  Leong is charged with conspiring "to materially omit and conceal and cause others to materially omit and conceal the details of the Kealoha payout from the City Council and the public."  [First Superseding Indictment at ¶ 26.[2]]  This conspiracy is alleged to involve: "induc[ing] HPD to pay for Kealoha's payout from salary funds allocated in HPD's budget in order to circumvent City

_____

[2] The Government also alleges that Leong made false statements to the Federal Bureau of Investigation during a criminal investigation in violation of 18 U.S.C. § 1001(a)(2). See First Superseding Indictment, Counts 2-6 at ¶¶ 34-36.  There is no indication that Ms. Sheehan will testify regarding the substance of these charges and thus the Court does not consider Counts 2-6 as part of its analysis.

14

Council approval[;]" [id. at ¶ 27;] "attempt[ing] to have HPD make materially false and misleading representations and omissions to the City Council . . ."; [id. at ¶ 28;] "provid[ing] materially false and misleading statements to federal agents during their investigation of the Kealoha payout[;]" [id. at ¶ 30;] and "induc[ing] and attempt[ing] to induce HPD to part with more than $250,000 in public funds belonging to the City for purpose of funding the Kealoha payout[,]" [id. at ¶ 32].  Contrary to the Government's statement that Ms. Sheehan's testimony "goes straight to the heart of the allegation that Leong conspired '[to omit and conceal the details of the settlement payment] from the City Council and the public[,]'" [Motion at 5-6 (quoting First Superseding Indictment at ¶ 26),] it is quite a stretch to represent that Ms. Sheehan, as a percipient witness, will testify adversely about any concealment of the settlement payment to Kealoha because she was quite open and vocal about her opposition.  See e.g., id. at 4 ("[Ms.] Sheehan told the press that the $250,000 payout to Kealoha was 'expensive, unnecessary, and very likely undeserved.'" (citation omitted)).  Moreover, her law firm (presumably including Mr. Otake as her law partner) publicized their approval of her vigorous and public opposition.  [Id. at 12 (quoting press release by the Law Firm).]

The Court concludes that, although the Government characterizes Ms. Sheehan as a "significant government witness" in the prosecution against Leong, [id. at 1,] there is no showing of **material** adversity.  Ms. Sheehan will apparently testify at trial about her opposition to and criticism of a $250,000 severance payment to Kealoha that was proposed by Leong, who was the head legal counsel for the City, and Defendant Max John Sword ("Sword"), who was the Police Commission's chairperson.  See Mem. in Supp. at 5.  This proposal was ultimately approved by the Police Commission over Ms. Sheehan's strong objections.  [Id.]  Ms. Sheehan and Leong took opposite positions on the issue of whether to pay severance to Kealoha.  However, their positions cannot be characterized as "materially adverse" in the instant case.  "Materiality" requires something significant or essential.  Compare Taniguchi v. Ass'n of Apartment Owners of King Manor, Inc., 114 Hawai`i 37, 50, 155 P.3d 1138, 1151 (2007) ("In general, a 'material fact' is defined as '[a] fact that is significant or essential to the issue or matter at hand.'" (alteration in Taniguchi) (quoting *Black's Law Dictionary* at 629)).  In this matter, the Government alleges that Leong, Sword and Defendant Keiji Amemiya conspired:

> a.   To embezzle, steal, obtain by fraud and
> otherwise without authority knowingly convert
> over $5,000 or more from a program receiving

16

federal funding, in violation of Title 18, Untied
States Code, Section 666(a)(1)(A); and

b.    To devise and intend to devise, with
the intent to defraud, a material scheme and
article to defraud and to obtain money and
property from persons by materially false and
fraudulent pretenses, representations, promises,
and omissions of material facts, in violation of
Title 18, United States Code, Section 1343.

[First Superseding Indictment at ¶¶ 25.a-25.b.]  The Government
alleges that the manner and means of the of conspiracy involved
concealing details of the severance payment to Kealoha from the
City Council and the public; [id. at ¶ 26;] inducing HPD to pay
the settlement from salary funds to avoid having to obtain City
Council approval; [id. at ¶ 27;] attempting to have HPD make
false and misleading representations and omissions to the City
Council; [id. at ¶ 28;] persuading HPD not to disclose the true
reason for seeking additional funding in the fourth quarter;
[id. at ¶ 29;] providing materially false and misleading
statements to federal agents about the severance payment; [id.
at ¶ 30;] causing communications and transmissions by means of
interstate wire to execute their fraud scheme; [id. at ¶ 31;]
and inducing HPD to part with more than $250,000 in public funds
for the severance payment to Kealoha, [id. at ¶ 32].  The
Government has not shown how Ms. Sheehan's opposition to the
severance paid Kealoha when and after it was presented to the
Police Commission plays any role in the alleged false and

17

misleading representations and omissions involving the City Council or to federal agents, and to inducing HPD to act in a manner to avoid obtaining City Council approval.  The Government has not explained how and why Ms. Sheehan's testimony will involve any of these allegations, much less what she had to do with the City Council's settlement approval process, HPD's funding representations, or the City's financial processing to obtain and pay Kealoha's severance.

In short, while Ms. Sheehan's and Leong's positions on the Kealoha severance payment were **diametrically opposed** as to whether to approve payment to Kealoha, Ms. Sheehan's proposed testimony is **not materially adverse** regarding the crimes alleged against Leong.  The Court therefore concludes that Rule 1.9(a) does not preclude Mr. Otake's representation of Leong because Leong's and Ms. Sheehan's interests are not "materially adverse" to one another.  As a result, Ms. Sheehan's testimony is not likely to result in Mr. Otake becoming "a necessary witness" at trial, as prohibited by HRPC 3.7.  See <u>Hillhouse v. Haw. Behav. Health, LLC</u>, Civ. No. CIV. 14-155 LEK-BMK, 2014 WL 4093185, at *5 (D. Hawai`i Aug. 18, 2014) (citing HRPC 3.7).

Finally, because the Court concludes that Ms. Sheehan is not currently a client of Otake; that Mr. Otake's representation of Leong will not be adverse to Ms. Sheehan's testimony as the Government's witness at trial; and that there

18

is no risk that Mr. Otake's representation of Leong will be materially limited by (what Ms. Sheehan believes to be) Mr. Otake's former representation of Ms. Sheehan, a concurrent conflict does not exist.  See Franson v. City & Cnty. of Honolulu, CIVIL NO. 16-00096 DKW-KSC, 2017 WL 372976, at *10 (D. Hawai`i Jan. 25, 2017) (citing HRPC 1.7(a)).

### B.   **Hawai`i Rules of Professional Conduct 1.9(b)**

Ms. Sheehan testified that an attorney-client relationship was formed with all of the attorneys at the Law Firm, including Mr. Otake, but possibly not with Matthew Winter, Esq.  See Rough Trans. at 6-7.  Thus, even if Mr. Otake did not formerly represent Ms. Sheehan, he is precluded from representing Leong if his law firm had formerly represented her and the following conditions exist:

> (b)  A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
>
> > (1)  whose interests are materially adverse to that person; and
> >
> > (2)  about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client consents after consultation, and confirms in writing.

HRPC 1.9(b).  Ms. Sheehan testified that she had an attorney-client relationship with her law partners regarding her work as

a police commissioner.  Thus, Mr. Otake is precluded from representing Leong if Leong's interests in the instant matter are "materially adverse" to Ms. Sheehan's interests.  For the reasons previously discussed, their interests are not materially adverse.

As to whether Mr. Otake acquired material information protected by Hawai`i Rules of Professional Conduct 1.6 and 1.9(c), the Court is unable to make this determination. Mr. Otake states that he has no memory of what Ms. Sheehan disclosed to him when he drove her to the airport, and Ms. Sheehan has not stated the specific substance of the information, except to state that it is confidential and it was about the Police Commission's vote on the Kealoha severance payment.  See Rough Trans. at 28, 7, 10-11.  However, even assuming the information is both protected and material, Ms. Sheehan has testified that she has no objections to Mr. Otake's continued representation of Leong so long as her attorney-client communications are not waived.  [Id. at 15.]

Even assuming that the Court's finding that Ms. Sheehan's testimony as a governmental witness is not materially adverse to Leong's defense is mistaken, Rule 1.9(b) does not preclude Mr. Otake's representation of Leong because of Ms. Sheehan's consent.  See HRPC 1.9(b); State v. Mark, 123 Hawai`i 205, 233-34, 231 P.3d 478, 506-07 (2010) (inferring that

20

assistance is constitutionally effective where consent is given

when there is concurrent representation of defendant and

government witness).

### III. Qualified Right to Counsel of Defendant's Choice

Leong's right to counsel of her choice is

constitutionally guaranteed:

> The right to select counsel of one's choice
> . . . has never been derived from the Sixth
> Amendment's purpose of ensuring a fair trial.  It
> has been regarded as the root meaning of the
> constitutional guarantee.  See Wheat [v. United
> States], 486 U.S. [153,] 159 [(1988)]; Andersen
> v. Treat, 172 U.S. 24 (1898).  See generally
> W. Beaney, The Right to Counsel in American
> Courts 18–24, 27–33 (1955).  Cf. Powell [v.
> Alabama], [287 U.S. 45,] 53 [(1932)].  Where the
> right to be assisted by counsel of one's choice
> is wrongly denied, therefore, it is unnecessary
> to conduct an ineffectiveness or prejudice
> inquiry to establish a Sixth Amendment violation.
> Deprivation of the right is "complete" when the
> defendant is erroneously prevented from being
> represented by the lawyer he wants, regardless of
> the quality of the representation he received.
> To argue otherwise is to confuse the right to
> counsel of choice — which is the right to a
> particular lawyer regardless of comparative
> effectiveness —with the right to effective
> counsel — which imposes a baseline requirement of
> competence on whatever lawyer is chosen or
> appointed.

United States v. Gonzalez-Lopez, 548 U.S. 140, 147–48 (2006)

(footnote omitted) (holding erroneous deprivation of right to

counsel of choice is a structural error requiring reversal of

conviction).  This right is a qualified one and, "where a court

justifiably finds an actual conflict of interest," it can

decline a waiver and require separate representation of defendants.  <u>Wheat</u>, 486 U.S. at 162.

Here, there is no actual conflict of interest.  There is, however, a subjective belief by Ms. Sheehan that Mr. Otake was her attorney for a limited time.  While the Court has found that Ms. Sheehan's belief is not objectively reasonable, it does lend itself to an argument that an implied attorney-client relationship possibly was formed.  Under these circumstances, Leong's fundamental right to counsel of her choice outweighs the possible implied attorney-client relationship that Ms. Sheehan subjectively believes was formed.  Additional safeguards can be put in place; namely, Ms. Sheehan's written consent to Mr. Otake's continued representation of Leong, and Leong's written consent to continued representation by Mr. Otake and waiver of any conflict based on Ms. Sheehan's belief that he was her attorney.

<u>**CONCLUSION**</u>

The Court has conducted a judicial inquiry into the alleged conflicts of interest raised by the Government and FINDS: that Mr. Otake does not have an actual conflict; that Leong has a fundamental right to counsel of her choice; and that Ms. Sheehan, as a governmental witness, is not material adverse to Leong.  Giving great deference to Leong's right to conflict-

free counsel and because of Ms. Sheehan's subjective belief that

Mr. Otake served for a limited time as her attorney, the Court:

-DIRECTS the Government to obtain and file a declaration from
     Ms. Sheehan that states, at a minimum: that she has
     consulted with the attorneys for the Government regarding
     the nature and scope of the testimony that the Government
     intends to present through her as a witness at trial; that
     she consents to Mr. Otake's representation of Leong,
     including at the trial in which Ms. Sheehan will be called
     to testify; that she does not waive any attorney-client
     privilege, if any exists, between herself and Mr. Otake;
     and that she waives any conflict, implied or actual, that
     may exist as a result of Mr. Otake's representation of
     Leong.  This declaration shall be filed no later than
     **April 27, 2023**; and

-DIRECTS Leong to file a declaration that states, at a minimum:
     that she has consulted with an independent counsel
     regarding the Motion and the Government's position that a
     potential or actual conflict of interest exists as to
     Mr. Otake's continued representation of her in the instant
     matter because of his law partnership with Ms. Sheehan, her
     role as a witness being called to testify against Leong,
     and her claim that Mr. Otake served as one of her attorneys
     during her term as a police commissioner; that Leong
     acknowledges being informed of the Court's finding that
     there is a slight possibility that an implied attorney-
     client relationship was formed between Ms. Sheehan and
     Mr. Otake for the purpose of advising Ms. Sheehan during
     her term as a police commissioner; and that she knowingly
     and intelligently waives any conflict, implied or actual,
     that exists in Mr. Otake's continued representation of her.
     This written waiver of conflict by no later than **April 27,
     2023.**

          IT IS SO ORDERED.

23

DATED AT HONOLULU, HAWAII, April 12, 2023.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**UNITED STATES OF AMERICA VS. DONNA YUK LAN LEONG, ET AL; CR 21-00142 LEK; ORDER REGARDING UNITED STATES' MOTION FOR JUDICIAL INQUIRY INTO CONFLICTS OF INTEREST WITH RESPECT TO ATTORNEY THOMAS M. OTAKE, [FILED 2/14/23 (DKT. MP. 194)]**